**NOTICE:** This order was filed under Illinois Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 240124-U

Order filed March 18, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 18th Judicial Circuit, Du Page County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-24-0124 Circuit No. 19-CF-2856 |
| | ) | |
| EMANUEL M. EMBRY, | ) ) | Honorable Michael W. Reidy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court.
Justices Holdridge and Anderson concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  Defendant's sentence was not excessive, and the trial court did not err in sentencing him.

¶ 2    Defendant, Emanuel M. Embry, appeals his 36-year sentence for aggravated vehicular hijacking with a firearm (720 ILCS 5/18-4(a)(4) (West 2018)). He contends his sentence was excessive, and the trial court considered improper factors in aggravation. We affirm.

¶ 3                                  I. BACKGROUND

¶ 4	In July 2022, defendant entered an open plea of guilty to aggravated vehicular hijacking with a firearm in exchange for the dismissal of charges of aggravated vehicular hijacking and armed robbery in a separate case that involved acts which occurred the same day.

¶ 5	The factual basis provided that on December 13, 2019, at approximately 2:24 p.m., Andrea Morris was sitting in her Kia Sportage in her driveway. Two men approached her on each side of the vehicle and ordered her to exit. Both men were armed with handguns. Morris exited her vehicle and began screaming. Her friend, Omar Tharani, was inside the house. Tharani heard Morris screaming and saw her vehicle leave the driveway. He entered his Dodge Charger and followed and located Morris's vehicle. Tharani had a concealed carry license and was armed. Tharani exited his vehicle and approached the Sportage, where he found two men. Tharani pointed his firearm at them and ordered them to exit the vehicle. Both individuals exited the Sportage and ran, one fleeing in the direction of a water treatment facility. Tharani drove the Sportage to a nearby gas station. At that point, one of the men entered Tharani's Charger and fled.

¶ 6	Surveillance video at the water treatment facility showed defendant charging his phone and making a phone call to his codefendant, Daysean Washington-Davis. A vehicle registered to Washington-Davis's sister picked defendant up from the water treatment facility. Later that night, codefendant Martavious Robinson was found in the Charger by police.

¶ 7	A video on Robinson's phone showed the three codefendants driving in an SUV at approximately 1 p.m. that day. Defendant was holding a revolver, which a detective would testify was the same revolver that was found in the Sportage when Tharani ordered the subjects out of the vehicle. The revolver was found on the passenger side, where defendant was sitting. Defendant admitted his involvement in the hijackings but denied ever touching a weapon.

¶ 8    The presentence investigation report (PSI) indicated Morris was visibly upset, pregnant, and had a hard time breathing after the carjacking. Defendant did not have a juvenile criminal history but was convicted of aggravated unlawful use of a weapon (AUUW) and sentenced to probation and community service in January 2019. His parents were separated for his entire life and he had not seen his father since he was 12. He had a good relationship with his mother and was primarily raised by her. His mother was unemployed and had one past arrest for unlawful possession of a controlled substance, but defendant reported that his mother had no history of substance abuse. Defendant reported good relationships with his half-brothers, one of whom passed away while defendant was in jail.

¶ 9    At the time of his arrest, defendant lived with his mother. He reported that "there was a moderate amount of crime" in the neighborhood and "drugs were easily available." Defendant was a senior at Innovations High School, an alternative school for students ages 16 to 21. While in jail, defendant attended various programs, including Alcoholics Anonymous, anger management, social services and education, Muslim worship, and job readiness, for a total of 70 hours. His stated goals were to get his GED and take college classes in prison. Defendant stated he no longer spoke to his codefendants but that they had previously been friends. Defendant indicated he was in good physical and mental health and had not experienced any abnormal psychological symptoms. Defendant began smoking marijuana when he was 12 or 13 years old, used ecstasy a couple of times, consumed alcohol on occasion, and used Xanax and cold medicine approximately four times a month between the ages of 17 and 19. Defendant admitted to having a drug problem and hoped to receive substance abuse treatment.

¶ 10    The PSI further stated, "defendant's criminal history suggests substance use, associations with antisocial peers, as well as a lack of effective coping and decision-making skills have been

3

the most pivotal factors impacting his behavior." Regarding his previous arrest for AUUW, defendant stated, "I had a gun for protection because I lived in a bad area."

¶ 11     The case proceeded to a sentencing hearing on May 1, 2023. The parties agreed the sentencing range was 21 to 45 years' imprisonment, to be served at 50%. The State told the court the parties had stipulated to the prior testimony of Sergeant Steven Klett, who testified at Washington-Davis's sentencing. Klett testified defendant, Robinson, and Washington-Davis each had cell phones that were connected to three hijackings. Klett also discussed the facts of this case as well as the other charges that were dismissed per the plea, which involved events occurring on the same day. The State also admitted into evidence two videos from Robinson's cell phone. One video depicted defendant, Robinson, and Washington-Davis dancing and displaying firearms. The other video was taken on the day of the incident, after the first hijacking, and showed the three men in a vehicle singing to music while defendant brandished a firearm. The State presented Morris's victim impact statement, which stated that, as the codefendants opened her car door, one said, "I'm going to fucking kill you." Morris had just found out she was pregnant two days prior to the incident. Morris said she had changed as a person since the incident and was "constantly worried, anxious, and scared to leave [her] home," and had been diagnosed with posttraumatic stress disorder and high anxiety.

¶ 12     The defense admitted a report on the science of late adolescence and a mitigation packet authored by a mental health clinician. In addition to the information contained in the PSI, the packet stated defendant had been shot at six times and had five friends killed by gun violence. The clinician reported defendant had never seen a counselor but had been suffering generalized anxiety disorder with panic attacks and major depressive disorder. The parties stipulated that if Klett was called to testify, he would indicate defendant used a respectful tone, was cooperative, and

voluntarily submitted to a DNA sample collection and search of his phone. A number of character letters were also admitted. The owner of the Discovery Initiative, an organization that provides leadership and development programs to low income families, indicated that defendant was a follower, supported his mother, was concerned for his safety, and "wanted to do better." Several other letters from defendant's friends and family members stated defendant was a "good person" and "amazing role model," was "kind hearted and generous," had potential, and was smart. Defendant had completed 111 hours of jail programming

¶ 13        The State argued that while defendant was young, his actions went beyond impulsiveness and youth. The State noted defendant was on probation at the time for possessing a firearm yet was "[s]till carrying guns." The State pointed to several jail incident reports in which defendant had threatened people, sworn at guards and failed to comply with orders, communicated with a codefendant he was to have no contact with, "hid[ ] a physical assault on another inmate from guards," and continued to take items from other inmates. The State argued defendant needed "to be sentenced not only to protect[ ] society from him, but to achieve the goal of both specific and general deterrence." It asked the court to sentence defendant to 40 years' imprisonment.

¶ 14        Defense counsel noted defendant had only had one prior police contact and pointed to his background detailed in the PSI and mitigation packet. Counsel argued defendant was not the ringleader and was very different from Washington-Davis. Counsel discussed defendant's youth and its attendant characteristics. Counsel asked for the minimum sentence of 21 years' imprisonment. Defendant gave a statement in allocution, indicating he was sorry for his actions.

¶ 15        The court indicated it considered all the evidence before it, including the PSI and evidence in aggravation and mitigation offered by the parties. In aggravation, the court discussed the facts and considered (1) the mental and emotional harm to Morris; (2) the fact that defendant appeared

5

to commit the offense "for the fun of it," noting defendant and his codefendants were "acting like they were in a rap video," listening to rap music and waving a gun around, which showed "blatant lawlessness"; (3) defendant's prior criminal offense and the fact he was on probation at the time of the instant offense; (4) the evidence showing defendant committed two separate offenses on the date in question; and (5) specific and general deterrence. While noting the threat of harm was a factor inherent in the offense, the court said it could consider the degree of harm. The court stated,

"So this Court is old enough to remember when the vehicular hijacking and aggravated vehicular hijacking offenses were codified. And I remember at the time it being somewhat of a novelty or extraordinarily uncommon for those types of offenses to have taken place. Nowadays this is no longer the case. There appears to have been a rash of vehicular hijackings lately. The degree to which carjacking has occurred is reminiscent of horse thieves from a time gone by. This blatant lawlessness can never, ever be countenanced by this Court or by a civilized society. It is important for those that would perpetrate that type of offense to see that there are dire consequences for undertaking such villainy. This is exactly the type of offense which cries out for a stiff penalty."

¶ 16 The court went through the factors in mitigation. It noted defendant indicated he grew up in a bad environment, had been shot at, and had friends killed by gun violence. The court recognized defendant was "possibly the product of a dangerous environment." However, it remarked, "that same environment should presumably give recognition to the type of behavior and conduct as being dangerous." The court found there was no evidence defendant acted under a strong provocation, and he "was directly involved in the actual taking of the cars and the sticking of guns in the faces of the victims." The fact defendant was on probation at the time he committed

6

the instant offense indicated to the court that the circumstances were likely to recur. The court discussed defendant's background, including that he was without a father, had a supportive mother who raised him alone, and lived in a neighborhood with a moderate amount of crime where drugs were easily available. The court mentioned the comment in the mitigation letter that defendant was a follower but stated the incidents in the jail were based on "his own conduct." The court questioned the character letters based on defendant's action in this case. Discussing defendant's youth and developing brain, the court noted that the facts of this case did not indicate impetuosity.

¶ 17    Ultimately, the court stated,

> "the Court finds that the Defendant through his crime spree is a menace to society and that it is necessary to remove him from civilized society. The Court further finds that there is ample evidence in aggravation and a dearth of mitigation to minimize the sentence, that a period of incarceration is necessary in order to not deprecate the seriousness of the offense, nor be inconsistent with the ends of justice."

The court sentenced defendant to 40 years' imprisonment.

¶ 18    Defendant moved to reconsider his sentence.[1] After a hearing, the court reduced defendant's sentence to 36 years' imprisonment. In doing so, the court noted it had extensively considered the evidence in aggravation and mitigation. The court further noted it "fashioned the sentence based upon what [defendant] pled to and that is, again, the Court has to consider the seriousness of the offense."

---

[1]We note that defendant initially filed such a motion, which was denied, and appealed. *People v. Embry*, No. 3-23-0223 (2023) (unpublished summary order under Illinois Supreme Court Rule 23(c)). The court remanded for new post-sentencing proceedings. As the initial motion to reconsider was superseded by these new proceedings, we only include the facts from the subsequent motion and hearing.

¶ 19                                    II. ANALYSIS

¶ 20        On appeal, defendant contends his sentence was excessive in light of various mitigating factors, such as his youth, his family support, his lack of criminal history, his remorse and acceptance of responsibility in the present case, and the fact his actions were purportedly less culpable than his codefendant's actions. He also contends the court considered improper factors in aggravation.

¶ 1        The Illinois Constitution states "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. To achieve this constitutionally mandated balance, the trial court must carefully consider all aggravating and mitigating factors, including "the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of [the] defendant's conduct in the commission of it." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002).

¶ 21        The trial court's sentencing decisions are entitled to great deference and will not be altered absent an abuse of discretion. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). We give the trial court such deference because it is in the best position to determine the appropriate sentence as it had the opportunity to weigh defendant's credibility, demeanor, moral character, mentality, environment, and age. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). A sentence that falls within the statutory range is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense or greatly at variance with the spirit and purpose of the law. *Alexander*, 239 Ill. 2d at 215.

8

¶ 22 It is up to the trial court to balance the relevant factors in mitigation and aggravation and make a reasoned decision as to the appropriate sentence. *People v. Latona*, 184 Ill. 2d 260, 272 (1998). "The burden is on the defendant to affirmatively establish that the sentence was based on improper considerations." *People v. Dowding*, 388 Ill. App. 3d 936, 943 (2009). While the court cannot ignore a pertinent mitigating factor (*People v. Powell*, 2013 IL App (1st) 111654, ¶ 35), the weight to be given to each factor depends on the facts and circumstances of each case. *Alexander*, 239 Ill. 2d at 213. When mitigating evidence is before the trial court, it is assumed that the court considered it, unless the record indicates otherwise. *People v. Burton*, 184 Ill. 2d 1, 34 (1998). On appeal, it is not our duty to reweigh the factors involved in the trial court's sentencing decision. *People v. Coleman*, 166 Ill. 2d 247, 261-62 (1995).

¶ 23 We conclude the trial court did not abuse its discretion. Defendant's 36-year sentence was within the applicable range (720 ILCS 5/18-4(a)(4), (b) (West 2018); 730 ILCS 5/5-4.5-25 (West 2018)) and is presumptively valid. See *Stacey*, 193 Ill. 2d at 210.

¶ 24 Defendant's argument amounts to an invitation to reweigh the evidence, which we will not do. See *Coleman*, 166 Ill. 2d at 261-62. When rendering its decision, the court indicated it had considered all the evidence before it. It considered the nature and circumstances of the offense and the history and character of defendant. The court was aware of and discussed defendant's youth. It took the time to consider the evidence in aggravation and mitigation, including defendant's upbringing. While discussing that defendant was labeled a follower, the court noted defendant had multiple infractions in the jail that were based on "his own conduct." The court considered the seriousness of the offense, the need for deterrence, and the fact that defendant was on probation at the time of the offense. The seriousness of the offense is the most important factor when sentencing. *People v. Murray*, 2020 IL App (3d) 180759, ¶ 30. "The trial court need not give

greater weight to any potential for rehabilitation than to the seriousness of the offense." *Id.* ¶ 33. Though defendant may believe the mitigating evidence should have been given more weight and warranted a lesser sentence, the court was not required to agree.

¶ 25     Moreover, the record does not indicate the court considered any improper factors when sentencing defendant. The court noted the threat of harm was inherent in the offense but considered the degree of harm, including the mental and emotional toll it took on Morris. This was a proper consideration. See *People v. Saldivar*, 113 Ill. 2d 256, 269 (1986). And the court could properly consider the nature and circumstances of the offense. *Quintana*, 332 Ill. App. 3d at 109. The court commented on the video of defendant singing to rap music and brandishing a weapon on the date of the offense as it indicated defendant did not appreciate the seriousness of his actions and was having fun while committing this offense. The court's comments about the offense did not indicate that it had a "personal policy of imposing harsh sentences for this offense," instead showing the need for deterrence and the necessity of the high statutory range. Viewed in the totality, we cannot say defendant's sentence was "greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Fern*, 189 Ill. 2d 48, 54 (1999).

¶ 26     In coming to this conclusion, we reject defendant's reliance on *Miller v. Alabama*, 567 U.S. 460, 471-72 (2012), and its progeny for the proposition that he should have been given a lesser sentence based on his youth. Defendant has cited no case law that applies *Miller* principles to a 19-year-old defendant who did not receive a *de facto* life sentence. Moreover, the court specifically discussed his youth and did not believe the facts of the case indicated impetuosity or immaturity.

¶ 27     We further reject defendant's argument he was entitled to a lower sentence based on his comparison to Washington-Davis. We note defendant did receive a lesser sentence—36 years'

imprisonment to Washington-Davis's 40 years' imprisonment. We cannot say that a comparison between the two entitles defendant to a lesser sentence than he received.

¶ 28                                    III. CONCLUSION

¶ 29          For the reasons stated, we affirm the judgment of the circuit court of Du Page County.

¶ 30          Affirmed.